**PELTON GRAHAM LLC**
Brent E. Pelton
pelton@peltongraham.com
Taylor B. Graham
graham@peltongraham.com
111 Broadway, Suite 1503
New York, NY 10006
Telephone: (212) 385-9700
www.peltongraham.com

*Attorneys for Plaintiffs and the*
*putative FLSA Collective*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **WILLIAM ESCALANTE, RUBEN BRUNO, and LUIS ORLANDO ZHININ, Individually and on Behalf of All Others Similarly Situated,**<br><br>**Plaintiffs,**<br><br>-against-<br><br>**FUNSAN K. CORP. d/b/a BEACON WINES & SPIRITS, KYONG SUK YI AS PERSONAL REPRESENTATIVE OF THE ESTATE OF CHI YOUNG CHUNG, DECEASED, KYONG SUK YI, and CHRISTOPHER RUDNEY, Jointly and Severally,**<br><br>**Defendants.** | **COLLECTIVE ACTION COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiffs William Escalante, Ruben Bruno and Luis Orlando Zhinin (collectively, the "Plaintiffs"), individually and on behalf of all others similarly situated, as collective representatives, upon personal knowledge as to themselves and upon information and belief as to other matters, allege as follows:

## NATURE OF THE ACTION

1.      Plaintiffs are former stockers, floor employees, counter employees, and delivery employees at Defendants' liquor store, Beacon Wines & Spirits, located in the Upper West Side neighborhood of Manhattan, New York County, New York. During the relevant time period, Defendants paid Plaintiffs and its other similarly situated employees a flat weekly rate or on an hourly basis that did not compensate employees at the statutory minimum wage or provide overtime premiums for hours worked in excess of forty (40) hours per week.

2.      Plaintiffs bring this action to recover unpaid minimum wage and overtime premium pay owed to them pursuant to both the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq*. and the New York Labor Law ("NYLL") §§ 650 *et seq.*  Plaintiffs also bring claims for unpaid spread-of-hours premiums and for Defendants' failure to provide accurate wage statements and wage notices pursuant to the NYLL and the supporting regulations.

3.      Plaintiffs bring their FLSA claims on behalf of themselves and all other similarly situated employees of Defendants and their NYLL claims on behalf of themselves and any individuals who opt-in to the case pursuant to Section 216(b) of the FLSA (the "Opt-In Plaintiffs").

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1337, and 1343, and supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.  In addition, the Court has jurisdiction over Plaintiffs' claims under the FLSA pursuant to 29 U.S.C. § 216(b).

5.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this district and Defendants maintain a business location in this district.

6.      This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

7.      On March 20, 2020, New York Governor Andrew M. Cuomo signed Executive Order 202.8 in an effort to stem the spread of COVID-19, which tolls for thirty (30) days "any specific time limit[s] for the commencement, filing, or service of any legal action, notice, motion or other process or proceeding" under any New York State laws or court procedural rules. The thirty (30)-day tolling period began on March 20, 2020 and continued until April 19, 2020. On April 7, 2020, Governor Cuomo signed Executive Order 202.14, which extended the tolling period to May 7, 2020. Subsequently, on May 7, 2020, Governor Cuomo issued Executive Order 202.28, tolling all statutes of limitations for an additional thirty (30) days through June 6, 2020. On June 6, 2020, Governor Cuomo issued Executive Order 202.38, tolling all statutes of limitations until July 6, 2020. On July 7, 2020, Governor Cuomo issued Executive Order 202.48 tolling all statutes of limitations until August 5, 2020. On August 5, 2020, Governor Cuomo issued Executive Order 202.55, which tolled all statutes of limitations until September 4, 2020. On September 4, 2020, Governor Cuomo signed Executive Order 202.60, which extended the tolling period an additional thirty (30) days to October 4, 2020. On October 4, 2020, Governor Cuomo issued Executive Order 202.67, which extended the tolling period to November 3, 2020. In total, the Executive Orders set forth herein provided for a tolling of the statute of limitations of two hundred and twenty-eight (228) days.

## THE PARTIES

**Plaintiffs:**

8.      <u>Plaintiff William Escalante</u> was, at all relevant times, an adult individual residing in Queens County, New York.

9.      Plaintiff Ruben Bruno was, at all relevant times, an adult individual residing in New York County, New York.

10.     Plaintiff Luis Orlando Zhinin was, at all relevant times, an adult individual residing in Queens County, New York.

11.     Throughout the relevant time period, Plaintiffs performed work for Defendants at Beacon Wines & Spirits, located at 2120 Broadway, New York, New York 10023.

12.     Plaintiffs consent in writing to be parties to this action, pursuant to 29 U.S.C. § 216(b), and their written consent forms are attached hereto and incorporated by reference.

**Defendants:**

13.     Defendant Funsan K. Corp. d/b/a Beacon Wines & Spirits ("Beacon Wines" or the "Corporate Defendant") is an active New York corporation with its principal place of business at 2120 Broadway, New York, New York 10023.

14.     According to the New York State Department of State, Division of Corporations, Funsan K. Corp. was registered on March 13, 1992.

15.     Defendant Kyong Suk Yi ("Suk Yi") is an owner and operator of the Corporate Defendant who sets the Corporate Defendant's payroll policies, including the unlawful practices complained of herein.  Throughout the relevant time period, Suk Yi was in charge of determining the Corporate Defendant's policies with respect to payroll, and otherwise running the business of the Corporate Defendant.

16.     Throughout the relevant time period until his passing on or about April 4, 2017, Chi Young Chung ("Young Chung") was an owner and operator of the Corporate Defendant who set the Corporate Defendant's payroll policies, including the unlawful practices complained of herein. Throughout the relevant time period, Young Chung was in charge of determining the

4

Corporate Defendant's policies with respect to payroll and otherwise running the business of the Corporate Defendant.

17.    <u>Defendant Suk Yi, as Personal Representative of the Estate of Chi Young Chung</u> (hereinafter, "Estate of Chi Young Chung") is named as a defendant herein in that capacity for the liability attributable to Young Chung while he was an employer of Plaintiffs prior to his death.

18.    <u>Defendant Christopher Rudney</u> ("Rudney" and, collectively with Suk Yi, Individually, and Suk Yi, Administrator, the "Individual Defendants" and together with the Corporate Defendant, the "Defendants") is an owner, manager, and/or operator of the Corporate Defendant who sets and/or implements the Corporate Defendant's payroll policies, including the unlawful practices complained of herein.  Throughout the relevant time period, Rudney determined the Corporate Defendant's payroll policies, and otherwise managed the day-to-day operations of the Corporate Defendant.

19.    The Individual Defendants maintained operational control over the Corporate Defendant and jointly managed Beacon Wines by determining the wages and compensation of employees, establishing the schedule of employees, maintaining employee records, and through possessing the authority to hire and fire employees, including Plaintiffs.

20.    The Individual Defendants jointly employed Plaintiffs, and all similarly situated employees, by acting in the interest of each other with respect to the employees, paying the employees by the same methods, and sharing control over the employees.

21.    The Individual Defendants participated in the day-to-day operations of the Corporate Defendant and acted intentionally and maliciously in their direction and control of Plaintiffs and the Corporate Defendant's other similarly situated employees, and are each an "employer" pursuant to the FLSA, 29 U.S.C. § 203(d) and regulations promulgated thereunder,

29 C.F.R. § 791.2, as well as the NYLL § 2 and the regulations thereunder, and are each jointly and severally liable with the Corporate Defendant.

22.     At all relevant times, the Defendants have been and continue to be employers engaged in interstate commerce and/or the production of goods for commerce, within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207 (a).

23.     At all relevant times, Defendants employed, and/or continue to employ, Plaintiffs and each of the Collective Action members within the meaning of the FLSA.

24.     At all relevant times, Plaintiffs, and any opt-in plaintiffs, were employed by Defendants within the meaning of the NYLL, §§ 2 and 651.

25.     Upon information and belief, at all relevant times, the Corporate Defendant have had gross revenues in excess of $500,000.00.

**<u>FLSA COLLECTIVE ACTION ALLEGATIONS</u>**

26.     Pursuant to 29 U.S.C. §§ 207 & 216(b), Plaintiffs bring their First through Seventh Causes of Action as a collective action under the FLSA on behalf of themselves and the following collective:

> All persons employed by Defendants at any time since January 28, 2018 and through the entry of judgment in this case (the "Collective Action Period") who worked as stockers, floor workers, counter employees, delivery employees, and/or other non-management employees at Beacon Wines & Spirits (the "Collective Action Members").

27.     A collective action is appropriate in this circumstance because Plaintiffs and the Collective Action Members are similarly situated, in that they were all subjected to Defendants' illegal policy of failing to pay the legally required minimum wage for all hours worked and pay overtime premiums for hours worked in excess of forty (40) hours per week.  As a result of these policies, Plaintiffs and the Collective Action Members did not receive the legally required

minimum wage for all hours worked and overtime premium payments for all hours worked in excess of forty (40) hours per week.

28.     Plaintiffs and the Collective Action Members have similar job duties and were paid pursuant to a similar, if not the same, payment structure.

## STATEMENT OF FACTS

### Defendants' Wine and Liquor Store

40.     At all relevant times, Defendants have been in the liquor store business. Upon information and belief, Defendants currently own, operate and manage two (2) liquor stores in the Upper West Side neighborhood of Manhattan: Beacon Wines & Spirits, located at 2120 Broadway, New York, New York 10023 and Mitchell's Wines & Liquor Store, located at 200 West 86th Street, New York, New York 10024.

41.     According to the New York Department of State – Division of Corporations filings, Defendant Chu Han Chung, son of the late Chi Young Chung and Defendant Suk Yi, is the Chief Executive Officer of Beacon Wines & Spirits.

42.     According to the "About Us" section on Defendants' webpage, *"...Beacon, located in Manhattan's Upper West Side, has been a purveyor of fine wines and spirits since 1992. One of New York's finest wine shops, we have a selection of over 5,000 different brands and serve customers all over the world"*. (http://www.beaconwine.com/customer-service/about-us.html).

43.     During the relevant time period and until the moment of his passing on or around April 4, 2017, Chi Young Chung was a constant presence at Beacon Wines on a daily basis, where Defendants maintain an office, and where he would oversee the operations of the store, supervise his employees, and implement the policies complained of herein.

45.     During the relevant time period, Individual Defendant Suk Yi appeared at Beacon

Wines approximately twice per week, to help in overseeing the daily operations of the store with her late husband Chi Young Chung.  When Chi Young Chung passed away, in April 2017, and until the present, Suk Yi became a constant presence on a daily basis at the liquor store, in order to supervise the employees and implement the policies complained of herein.

46.     Upon information and belief, Defendant Christopher Rudney, is a constant and daily presence at Beacon Wines where he oversees the operations of the liquor store, supervises employees, handles payroll matters, and implements the policies complained of herein.

**Plaintiffs' Work for Defendants**

47.     **Plaintiff William Escalante** worked for Defendants as a stocker, floor worker, and delivery employee from in or around August 2014 to in or around April 2020 (the "Escalante Employment Period").

48.     Plaintiff Escalante's duties at Beacon Wines included, without being limited to, unloading boxes from delivery trucks and placing them in storage, replacing inventory on the shelves, cleaning, disposing of boxes, making customer deliveries on foot, assisting delivery drivers, and taking care of customers at the liquor store.

49.     At the beginning of the Escalante Employment Period, from in or around 2014 to in or around December 2017, Plaintiff Escalante was required to work six (6) days per week, with most Wednesdays off.  Plaintiff Escalante typically worked from approximately 12:00 pm to approximately 10:00 pm, for a total of approximately sixty (60) hours per week.  On occasions, especially during holiday seasons, Plaintiff Escalante's shifts could last beyond ten (10) hours per day, up to approximately between 10:15 pm and 10:20 pm.

50.     From in or around January 2018 to the end of his employment period, Plaintiff Escalante was required to work five (5) days per week, with most Wednesdays and Saturdays off.

During that period, Plaintiff Escalante was scheduled from approximately 2:00 pm to approximately 10:00 pm, for a total of approximately forty (40) hours per week but arrived earlier in order to commence his shift on time, and/or left after the end of his shift until the last customer at the store was attended to, such that on average he worked a total of approximately forty-two (42) hours per week, at least once or twice per month.

51. From in or around October 2014 until in or around December 2017, Plaintiff Escalante was paid a fixed salary in the amount of four hundred and eighty dollars ($480.00) per week, for all hours worked, including those beyond forty (40) in a given workweek.

52. From in or around January 2018 to the end of his employment period in or around April 2020, Plaintiff Escalante was paid on an hourly basis. From in or around January 2018 to in or around December 2018, Plaintiff Escalante was paid thirteen dollars ($13.00) per hour. From in or around January 2019 to in or around April 2020, at the end of his employment period, Plaintiff Escalante was paid fifteen dollars ($15.00) per hour. During this period, if Plaintiff Escalante worked beyond forty (40) hours in a given workweek, Defendants only paid for the hours Plaintiff Escalante was scheduled to work during the week, up to forty (40) hours per week, and not the actual number of hours registered on the time clock system installed at the liquor store.

53. From the beginning of the Escalante Employment Period to in or around December 2017, Plaintiff Escalante received his wages entirely in cash each week, which he received in an envelope with his name written on it. During that time period, Plaintiff Escalante's wages were not accompanied by any pay stub, wage statement, or any other record showing his hours worked, rates of pay, or any other payment information.

54. Beginning in or around March 2016, Plaintiff Escalante was required to sign a document in order to receive his cash wages each week. This document typically listed a specific

rate per hour, which Plaintiff Escalante believed was the legally-required minimum wage at that time, and another rate for the hours worked beyond forty (40) in a given workweek, even though at that time Plaintiff Escalante was still receiving a fixed salary as compensation for all hours worked. It was Plaintiff Escalante's understanding that Defendants began requiring employees to sign these documents upon being sued for unpaid wages.

55.     From in or around January 2018 to the end of his employment period, Plaintiff Escalante received his wages by check, accompanied by a pay stub that often times did not show the actual number of hours worked in a given workweek.

56.     **Plaintiff Ruben Bruno** worked for Defendants as a stocker, floor worker, and counter employee from in or around November 1996 to on or about January 21, 2019 (the "Bruno Employment Period").

57.     Plaintiff Bruno's duties at Beacon Wines included, without being limited to, unloading boxes from delivery trucks and placing them in storage, replacing inventory on the shelves, cleaning, disposing of boxes, and taking care of customers at the liquor store either at the counter of the liquor store or on the floor as a sales associate.

58.     From the beginning of the Bruno Employment Period, and during the relevant time period from in or around 2014 to in or around December 2017, Plaintiff Bruno was required to work six (6) days per week, with most Mondays off.  Plaintiff Bruno's hours typically were from approximately 12:00 pm to approximately 10:00 pm, for a total of approximately sixty (60) hours per week.  Although Plaintiff Bruno typically worked shifts consisting of at least ten (10) hours per day, on average once per week, Plaintiff Bruno's shifts could last beyond ten (10) hours, up to approximately between 10:15 pm and 10:20 pm.

59.     From in or around January 2018 to the end of his employment period in or around

January 2019, Plaintiff Bruno was required to work five (5) days per week, with most Mondays and Thursdays off.  During that period, Plaintiff Bruno's hours were from approximately 2:00 pm to approximately 10:00 pm, for a total of approximately forty (40) hours per week, and sometimes more.

60.     From in or around January 2018 to the end of his employment period in or around January 2019, it was common for Plaintiff Bruno to work hours beyond forty (40) in a workweek, due to the fact that he came to the liquor store before his scheduled start time in order to not be late arriving and usually left the store after taking care of the last customers, which often times occurred after 10:00 pm.  For that reason, the timeclock machine at the liquor store, and by Plaintiff Bruno's own records, showed an average of approximately forty-two (42) to forty-three (43) hours per week.  Despite the fact that the timeclock machine correctly displayed the number of hours worked during a giving workweek, Plaintiff Bruno's pay stubs during this time period always reflected only up to forty (40) hours per week, such that he was not paid for all hours that he worked.

61.     For his work, and during the relevant time period, from in or around 2014 to in or around 2015, Plaintiff Bruno was paid a fixed salary in the amount of four hundred and forty dollars ($440.00) per week, for all hours worked, including those beyond forty (40) in a given workweek.  From in or around 2015 to in or around 2016, Plaintiff Bruno was paid a fixed salary in the amount of four hundred and sixty dollars ($460.00) per week, for all hours worked, including those beyond forty (40) in a given workweek.  From in or around 2016 until in or around December 2017, Plaintiff Bruno was paid the amount of five hundred and thirty dollars ($530.00) per week, for all hours worked including those beyond forty (40) in a given workweek.

62.     From in or around January 2018 to the end of his employment period in or around

January 2019, Plaintiff Bruno was paid on an hourly basis. From in or around January 2018 to in or around December 2018, Plaintiff Bruno was paid the amount of thirteen dollars ($13.00) per hour. For his last month of employment at Beacon Wines in or around January 2019, Plaintiff Bruno was paid the amount of fifteen dollars ($15.00) per hour.

63.     From the beginning of the Bruno Employment Period to in or around December 2017, Plaintiff received his wages on a weekly basis entirely in cash, which he received in an envelope with his name written on it. During that time period, Plaintiff Bruno's wages were not accompanied by any pay stub, wage statement, or any other record showing his hours worked, rates of pay, or any other payment information.

64.     Beginning in or around March 2016, in order for Plaintiff Bruno to receive his cash wages, he was required by Defendants to sign a document each pay period. The aforementioned document showed at that time a specific rate per hour, which Plaintiff Bruno believed to be the legally-required minimum wage, and another rate for the hours worked beyond forty (40) in a given workweek, despite the fact that at that time Plaintiff Bruno was still receiving a fixed salary as compensation for all hours worked. It was Plaintiff Bruno's understanding that Defendants began requiring that their employees sign these documents after they were previously sued for unpaid wages.

65.     From in or around January 2018 to the end of his employment period, Plaintiff Bruno received his wages by check, accompanied by a pay stub that typically did not reflect the accurate number of hours worked during a workweek.

66.     **Plaintiff Luis Orlando Zhinin** worked for Defendants as a stocker, floor worker, and counter employee from in or around 2001 to in or around March 2020 (the "Zhinin Employment Period").

67.     Plaintiff Zhinin's duties at Beacon Wines included, without being limited to, unloading boxes from delivery trucks and placing them in storage, replacing inventory on the shelves, cleaning, disposing of boxes, and taking care of customers at the liquor store mainly at the counter.

68.     From the beginning of the Zhinin Employment Period, and during the relevant time period, from in or around 2014 to in or around December 2017, Plaintiff Zhinin was required to work six (6) days per week, with most Thursdays off.  Plaintiff Zhinin's hours typically were from approximately 10:00 am to approximately 8:00 pm, for a total of approximately sixty (60) hours per week.  Although Plaintiff Zhinin was scheduled to work (10) hour shifts per day, at least once per week, Plaintiff Zhinin worked past his shift end time, until at least 8:15 pm.

69.     From in or around January 2018 to the end of his employment period in or around March 2020, Plaintiff Zhinin was required to work five (5) days per week, with most Thursdays and Sundays off.  During that period, Plaintiff Zhinin's hours were from approximately 2:00 pm to approximately 10:00 pm, for a total of approximately forty (40) hours per week.  However, Plaintiff Zhinin frequently worked beyond his schedule, arriving earlier than his start time to prepare to start his shift on time, and leaving the liquor store after cleaning the premises, such that at least one or two weeks per month he worked an average of between forty-one (41) to forty-two (42) hours each week.

70.     For his work, and during the relevant time period, from in or around 2014 to in or around 2015, Plaintiff Zhinin was paid a fixed salary in the amount of three hundred dollars ($300.00) per week, for all hours worked, including those beyond forty (40) in a given workweek. From in or around 2015 to in or around 2016, Plaintiff Zhinin was paid a fixed salary in the amount of three hundred and fifty dollars ($350.00) per week, for all hours worked, including those beyond

forty (40) in a given workweek.  From in or around 2016 until in or around December 2017, Plaintiff Zhinin was paid a fixed salary of four hundred dollars ($400.00) per week, for all hours worked including those beyond forty (40) in a given workweek.

71.     From in or around January 2018 to the end of his employment period in or around March 2020, Plaintiff Zhinin began to receive an hourly rate for all hours worked.  From in or around January 2018 to in or around December 2018, Plaintiff Zhinin was paid the amount of thirteen dollars ($13.00) per hour.  From in or around January 2019 to in or around March 2020, Plaintiff Zhinin was paid the amount of fifteen dollars ($15.00) per hour.

72.      From the beginning of the Zhinin Employment Period to in or around December 2017, Plaintiff Zhinin received his wages weekly entirely in cash, which he received in an envelope that had his name written on it.  During that time period, Plaintiff Zhinin's wages were not accompanied by any pay stub, wage statement, or other record showing his hours worked, rates of pay, or any other payment information.

73.     Beginning in or around March 2016, Defendants required Plaintiff Zhinin to sign a document each week in order to receive his wages. This document typically listed a specific rate per hour. Plaintiff Zhinin was told by other co-workers that those amounts could be the legally-required minimum wage, and another rate for the hours worked beyond forty (40) in a given workweek, despite the fact that at that time Plaintiff Zhinin was still receiving a fixed salary as compensation for all hours worked at Defendants' establishment. It was Plaintiff Zhinin's understanding that Defendants required employees to sign these documents upon being sued for unpaid wages.

74.     From in or around January 2018 to the end of his employment period, Plaintiff Zhinin received his wages by check, accompanied by a pay stub that usually did not reflected the

accurate number of hours worked during a workweek.

75.    During the vast majority of Plaintiffs' respective employment periods, Defendants did not provide Plaintiffs with any reliable method to track their time worked at the liquor store. From in or around 2016, and after being sued for improperly paying their employees, Defendants installed a time clock machine at the liquor store, but Defendants did not pay Plaintiffs based on the actual hours recorded in the machine.

76.    At the beginning of Plaintiffs' respective employment periods, Plaintiffs witnessed the late Chi Young Chung on a daily basis at Beacon Wines. Plaintiffs also saw Defendant Suk Yi appear at the liquor store at least twice per week. After the death of Chi Young Chung, in or around April 2017, Plaintiffs observed Defendant Suk Yi on a daily basis at the liquor store, where she supervised the work of the employees, discussed issues regarding the administration of the store with Defendant Rudney, and made decisions regarding wage payments, hiring and firing employees, and in general, all decisions regarding the administration of Beacon Wines.

77.    Although Plaintiffs typically worked well over forty (40) hours per week and performed non-exempt duties, until in or around December 2017, Plaintiffs were paid a flat weekly rate, which did not compensate them at the statutory minimum wage for much of their respective employment periods and/or provide overtime premiums for all hours worked in excess of forty (40) per week.

78.    Although beginning in or around December 2017, Defendants compensated Plaintiffs at regular hourly rates for all hours worked instead of their purported fixed salary per week, Plaintiffs were only compensated for their scheduled hours, up to a forty (40) hour workweek, which was reflected in Plaintiffs' paystubs, even though the time clock system installed by Defendants at Beacon Wines recorded a higher number of hours worked during the workweek.

79.     Throughout Plaintiffs' respective employment periods, particularly before the death of Chi Young Chung in or around April 2017 and until the end of 2017, Plaintiffs frequently worked in excess of ten (10) hours per day, yet Defendants failed to pay Plaintiffs spread-of-hours premiums.

80.     At no point during Plaintiffs' respective employment periods, did Plaintiffs receive a wage notice showing their hourly or overtime rate, among other information required by the NYLL.

81.     Plaintiffs' work was performed in the normal course of Defendants' business and was integrated into Defendants' business.

82.     The work performed by Plaintiffs at Defendants' establishment required little skill and no capital investment.

**Defendants' Unlawful Corporate Policies**

83.     Plaintiffs and the Opt-In Plaintiffs were all paid pursuant to the same corporate policies of Defendants, specifically failing to pay minimum wage for all hours worked, failing to pay overtime premiums, and failing to pay spread of hours premiums.

84.     Notwithstanding the fact that Plaintiffs, and Opt-In Plaintiffs, frequently worked more than ten (10) hours in a given day, Defendants failed to pay them spread of hours premiums equal to one (1) additional hour of minimum wage for each day worked in excess of ten (10) in a given day.  Defendants' failure to pay Plaintiffs and the Opt-In Plaintiffs spread of hours premiums was a corporate policy that applied to all of Defendants' employees who worked shifts of more than ten (10) hours in a workday and/or split shifts.

85.      Plaintiffs have spoken with other employees of Defendants, who similarly worked in excess of forty (40) hours during the Class Period, were similarly paid a flat weekly rate for

non-exempt work that did not provide overtime premiums of one and one-half (1.5) times their regular hourly rate for all hours worked over (40) per week or sometimes worked beyond the forty (40) hours per week and those hours were not properly accounted by Defendants in their records. Defendants' failure to pay Plaintiffs and the Opt-In Plaintiffs overtime compensation for all hours worked over forty (40) hours per week was a corporate policy of Defendants, which applied to all stockers, floor workers, delivery employees, and other non-management employees.

86.     Plaintiffs have spoken with other employees of Defendants, who similarly were paid in cash before January 2018 and were not provided with any wage statement. Defendants' failure to provide proper wage statements in accordance with the requirements of the NYLL was a corporate policy that applied to all stockers, floor workers, delivery employees, and other non-management employees throughout the Class Period.

87.     Defendants' policy of paying certain employees on a "salary" basis rather than an hourly basis after January 1, 2011, violated 12 N.Y.C.R.R. § 146-2.5.

88.     Defendants did not provide Plaintiffs and the Opt-In Plaintiffs with proper wage notices at the time of hire or by February 1 of each year or when their wage rate(s) changed. Defendants' failure to provide wage notices in accordance with the requirements of the NYLL was a corporate policy that applied to all stockers, floor workers, delivery employees, and other non-management employees.

89.     Upon information and belief, throughout the Class Period, Defendants have failed to maintain accurate and sufficient time and payroll records or provide such records to employees.

90.     Throughout the Class Period and, upon information and belief, continuing until today, Defendants have employed other individuals like Plaintiffs in the normal course of business and in positions that require little skill and no capital investment.

**FIRST CAUSE OF ACTION**
**FAIR LABOR STANDARDS ACT – UNPAID MINIMUM WAGE**
**(Brought on Behalf of Plaintiffs and the Collective Members)**

91.     Plaintiffs, on behalf of themselves and the Collective Action Members, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

92.     By failing to pay minimum wage for all hours worked, Defendants have violated and continue to violate the FLSA, 29 U.S.C. §§ 201 *et seq.*, including 29 U.S.C. §§ 206 and 215(a)(2).

93.     The foregoing conduct, as alleged, constitutes a willful violation of the FLSA within the meaning of 29 U.S.C. § 255(a).

94.     Defendants' failure to pay minimum wages for all hours worked caused Plaintiffs and the Collective Action Members to suffer loss of wages and interest thereon.  Therefore, Plaintiffs and the Collective Action Members are entitled to recover from Defendants their unpaid minimum wages, damages for unreasonably delayed payment of wages, liquidated damages, reasonable attorneys' fees, and costs and disbursements of the action pursuant to 29 U.S.C. § 216(b).

**SECOND CAUSE OF ACTION**
**FAIR LABOR STANDARDS ACT – UNPAID OVERTIME**
**(Brought on Behalf of Plaintiffs and the Collective Action Members)**

95.     Plaintiffs, on behalf of themselves and the Collective Action Members, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

96.     By failing to pay overtime at a rate not less than one and one-half (1.5) times the regular rate of pay for work performed in excess of 40 hours per week, Defendants have violated

and continue to violate the FLSA, 29 U.S.C. §§ 201 *et seq.*, including 29 U.S.C. §§ 207(a)(1) and 215(a)(2).

97.     The foregoing conduct, as alleged, constitutes a willful violation of the FLSA within the meaning of 29 U.S.C. § 255(a).

98.     Defendants' failure to pay overtime caused Plaintiffs and the Collective Action Members to suffer loss of wages and interest thereon. Plaintiffs and the Collective Action Members are entitled to recover from Defendants their unpaid overtime premium compensation, damages for unreasonably delayed payment of wages, liquidated damages, reasonable attorneys' fees, and costs and disbursements of the action pursuant to 29 U.S.C. § 216(b).

**THIRD CAUSE OF ACTION**
**NEW YORK LABOR LAW – UNPAID MINIMUM WAGE**
**(Brought on Behalf of Plaintiffs and the Opt-In Plaintiffs)**

99.     Plaintiffs, on behalf of themselves and the Opt-In Plaintiffs, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

100.    Defendants willfully violated Plaintiffs and the Opt-In Plaintiffs' rights by failing to pay minimum wage for all hours worked, in violation of the NYLL and regulations promulgated thereunder.

101.    Defendants' failure to pay minimum wage for all hours worked caused Plaintiffs and the Opt-In Plaintiffs' to suffer loss of wages and interest thereon. Plaintiffs and the Opt-In Plaintiffs are entitled to recover from Defendants their unpaid minimum wages, damages for unreasonably delayed payment of wages, liquidated damages, reasonable attorneys' fees, and costs and disbursements of the action pursuant to NYLL §§ 663(1) *et seq.*

**FOURTH CAUSE OF ACTION**
**NEW YORK LABOR LAW – UNPAID OVERTIME**
**(Brought on Behalf of Plaintiffs and the Opt-In Plaintiffs)**

102.    Plaintiffs, on behalf of themselves and the Opt-In Plaintiffs, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

103.    Defendants willfully violated Plaintiffs and the Opt-In Plaintiffs' rights by failing to pay overtime compensation at a rate of not less than one and one-half times the regular rate of pay for hours worked in excess of 40 each week, in violation of the NYLL and regulations promulgated thereunder.

104.    Defendants' failure to pay overtime premium compensation caused Plaintiffs and the Opt-In Plaintiffs to suffer loss of wages and interest thereon.  Plaintiffs and the Opt-In Plaintiffs are entitled to recover from Defendants their unpaid overtime compensation, damages for unreasonably delayed payment of wages, liquidated damages, reasonable attorneys' fees, and costs and disbursements of the action pursuant to NYLL §§ 663(1) *et seq.*

**FIFTH CAUSE OF ACTION**
**NEW YORK LABOR LAW – UNPAID SPREAD-OF-HOURS**
**(Brought on Behalf of Plaintiffs and the Opt-In Plaintiffs)**

105.    Plaintiffs, on behalf of themselves and the Opt-In Plaintiffs, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

106.    Defendants willfully violated Plaintiffs and the Opt-In Plaintiffs' rights by failing to pay compensation in an amount equal to one hour's pay at the relevant minimum wage in all instances where the Opt-In Plaintiffs worked either a split shift or more than 10 hours per day, in

violation of the NYLL §§ 650, *et seq.*, and the regulations promulgated thereunder including N.Y. Comp. Code R. & Regs. tit. 12, §§ 137-1.7 (2010), 146.16 (2012).

107.    Defendants' failure to pay spread-of-hours compensation caused Plaintiffs and the Opt-In Plaintiffs to suffer loss of wages and interest thereon.  Plaintiffs and the Opt-In Plaintiffs are entitled to recover from Defendants their unpaid spread-of-hours compensation, damages for unreasonably delayed payment of wages, liquidated damages, reasonable attorneys' fees and costs and disbursements of the action pursuant to NYLL §§ 663(1) *et seq.*

**SIXTH CAUSE OF ACTION**
**<u>NEW YORK LABOR LAW – FAILURE TO PROVIDE WAGE NOTICES</u>**
**(Brought on Behalf of Plaintiffs and the Opt-In Plaintiffs)**

108.    Plaintiffs, on behalf of themselves and the Opt-In Plaintiffs, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

109.    Defendants have willfully failed to supply Plaintiffs and the Opt-In Plaintiffs notice as required by Article 6, § 195(1), in English or in the language identified by Plaintiffs and the Opt-In Plaintiffs as their primary language, containing Plaintiffs' and Opt-In Plaintiffs' rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; hourly rate or rates of pay and overtime rate or rates of pay, if applicable; the regular pay day designated by the employer in accordance with the NYLL, Article 6, § 191; the name of the employer; or any "doing business as" names used by the employer' the physical address of the employer's main office or principal place of business, and a mailing address if different; the telephone number of the employer; plus such other information as the commissioner deems material and necessary.

110.    Due to Defendant's violations of the NYLL, Plaintiffs and the Opt-In Plaintiffs are entitled to recover from Defendants fifty dollars ($50.00) per employee for each day that the

violations occurred or continue to occur, up to a maximum of five thousand dollars ($5,000.00) per employee, as provided for by NYLL, Article 6, §§ 190, *et seq*., liquidated damages as provided for by the NYLL, reasonable attorneys' fees, costs, pre-judgment and post-judgment interest, and injunctive and declaratory relief.

**SEVENTH CAUSE OF ACTION**
**NEW YORK LABOR LAW – FAILURE TO PROVIDE WAGE STATEMENTS**
**(Brought on Behalf of Plaintiffs and the Opt-In Plaintiffs)**

111.    Plaintiffs, on behalf of themselves and the Opt-In Plaintiffs, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

112.    Defendants have willfully failed to supply Plaintiffs and Opt-In Plaintiffs with an accurate statement of wages as required by NYLL, Article 6, § 195(3), containing the dates of work covered by that payment of wages; name of employee; name of employer; address and phone number of employer; rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; gross wages; hourly rate or rates of pay and overtime rate or rates of pay if applicable; the number of hours worked, including overtime hours worked if applicable; deductions; and net wages.

113.    Due to Defendants' violations of the NYLL, Plaintiffs and the Opt-In Plaintiffs are entitled to recover from Defendants two hundred and fifty dollars ($250.00) per employee for each day that the violations occurred or continue to occur, up to a maximum of five thousand dollars ($5,000.00) per employee, as provided for by NYLL, Article 6, §§ 190 *et seq.*, liquidated damages as provided for by the NYLL, reasonable attorneys' fees, costs, pre-judgment and post-judgment interest, and injunctive and declaratory relief.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs, on behalf of themselves and all other similarly situated Collective Action Members and Opt-In Plaintiffs, respectfully request that this Court grant the following relief:

a.　Designation of this action as a collective action on behalf of the Collective Action Members and ordering the prompt issuance of notice pursuant to 29 U.S.C. § 216(b) to all similarly situated members of an FLSA Opt-In Class, apprising them of the pendency of this action, permitting them to assert timely FLSA claims in this action by filing individual Consents to Sue pursuant to 29 U.S.C. § 216(b) and appointing Plaintiffs and their counsel to represent the Collective Action Members;

b.　An order tolling the statute of limitations;

c.　A declaratory judgment that the practices complained of herein are unlawful under the FLSA and the NYLL;

d.　An injunction against Defendants and its officers, agents, successors, employees, representatives and any and all persons acting in concert with Defendants, as provided by law, from engaging in each of the unlawful practices, policies and patterns set forth herein;

e.　An award of compensatory damages as a result of Defendants' failure to pay minimum wage and overtime compensation pursuant to the FLSA and the NYLL and supporting regulations;

f.　An award of liquidated and/or punitive damages as a result of the Defendants' willful failure to pay minimum wages and overtime compensation pursuant to the FLSA and the NYLL and supporting regulations;

g.      An award of actual and liquidated damages for the non-payment of spread-of-hours pay for each split shift and/or shift worked in New York in excess of ten hours;

h.      Fifty dollars ($50.00) per Plaintiff and each of the Opt-In Plaintiffs for each day that the violations of NYLL, Article 6 § 195(1) occurred or continue to occur, up to a maximum of five thousand dollars ($5,000.00) per Plaintiff and each of the Opt-In Plaintiffs as provided for by NYLL, Article 6 § 198(1)-b;

i.      Two hundred and fifty dollars ($250.00) per Plaintiff and each of the Opt-In Plaintiffs for each day that the violations of NYLL, Article 6 § 195(3) occurred or continue to occur, up to a maximum of five thousand dollars ($5,000.00) per Plaintiff and each of the Opt-In Plaintiffs as provided for by NYLL, Article 6 § 198(1)-d;

j.      An award of prejudgment and post-judgment interest;

k.      An award of costs and expenses of this action together with reasonable attorneys' and expert fees; and

l.      Such other and further relief as this Court deems just and proper.

## **DEMAND FOR TRIAL BY JURY**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all questions of fact raised by the complaint.

Dated:  New York, New York
       January 28, 2021

Respectfully submitted,

**PELTON GRAHAM LLC**

By: _____
Brent E. Pelton
pelton@peltongraham.com
Taylor B. Graham
graham@peltongraham.com
111 Broadway, Suite 1503
New York, New York 10006
Telephone: (212) 385-9700
Facsimile: (212) 385-0800

*Attorneys for Plaintiffs and the putative*
*FLSA Collective*

**Notice of Shareholder Liability for Services Rendered
Pursuant to § 630 of the Business Corporation Law of New York**

Pursuant to the provisions of § 630 of the Business Corporation Law of New York ("NYBCL"), the ten (10) largest shareholders of FUNSAN K. CORP. are hereby notified that the plaintiff in this matter, individually and on behalf of the putative FLSA collective and the Class he seeks to represent, intends to enforce your personal liability, as the ten (10) largest shareholders of FUNSAN K. CORP., and charge you with indebtedness of said corporations to the plaintiffs for services performed for the corporations as employees during the six (6) year period, plus an additional 228 days preceding the filing of this complaint.

Dated:  January 28, 2021

_____
Brent E. Pelton

## CONSENT TO BECOME PARTY PLAINTIFF

By my signature below, I hereby authorize the filing and prosecution of claims in my name and on my behalf to contest the failure of **Funsan K. Corp. d/b/a Beacon Wines & Spirits,** and/or their respective owners, affiliated companies, subsidiaries, contractors, directors, officers, franchisees and/or affiliates to pay me overtime wages and minimum wages as required under state and/or federal law, and also authorize the filing of this consent in the action(s) challenging such conduct.  I authorize being **named as the representative plaintiff** in this action to make decisions on behalf of all other plaintiffs concerning the litigation, the method and manner of conducting this litigation, the entering of an agreement with Plaintiff's counsel concerning attorneys' fees and costs, and all other matters pertaining to this lawsuit.  I understand that I will be represented by Pelton Graham LLC without prepayment of costs or attorneys' fees. I understand that if plaintiffs are successful, costs expended by attorneys on my behalf will be deducted from my settlement or judgment first.  I understand that my attorneys may petition the court for an award of fees and costs to be paid by defendants on my behalf.  I understand that the fees retained by the attorneys will be either the amount received from the defendants or approximately 1/3 (33.33%) of my total settlement or judgment amount (including fees), whichever is greater.

_____
Signature

William Escalante
_____
Printed Name

## CONSENTIMIENTO PARA SER UN DEMANDANTE

Por mi firma abajo yo autorizo la presentación y tramitación de una acción legal en mi nombre y representación en contra de Funsan K. Corp. d/b/a Beacon Wines & Spirits y sus respectivos propietarios, gerentes, oficiales, directores, sucesores, predecesores, subsidiarias y afiliados para que me sean pagados las horas extras y los salarios mínimos tal como lo requieren las normas estatales y/o federales e igualmente autorizo la presentación de este consentimiento en la acción(es) con el fin de debatir la conducta ilegal. Yo autorizo ser nombrado como **demandante representativo** en esta acción legal para tomar decisiones en nombre de otros demandantes a quienes pueda concernir el resultado de este proceso, el método y la manera en cómo debe llevarse a cabo este litigio, y la decisión de llegar a un acuerdo dentro de la causa y todo lo que concierna a los honorarios profesionales y costas del proceso y cualesquiera otras decisiones relacionadas con este litigio. Yo entiendo que estaré representado por Pelton Graham LLC sin tener que pagar por adelantado costas u honorarios de abogados. Yo entiendo que, si los demandantes tienen éxito, los costos asumidos por los abogados en mi nombre serán deducidos inicialmente de la porción de mi acuerdo en una conciliación o como resultado de una sentencia en juicio. Yo entiendo que mis abogados podrán solicitar a la Corte que les sean retribuidos los honorarios y costas procesales por parte de los demandados en nombre mío.  Yo entiendo que los valores de retención de los abogados podrán ser ya sea el monto recibido por parte de los demandados o el monto aproximado de 1/3 (33.33%) del total del acuerdo de conciliación o del valor obtenido a través de la sentencia (incluyendo honorarios), cual sea la suma más alta.

_____
Firma

William Escalante
_____
Nombre Escrito

This is a complete and accurate translation of the English "Consent to Become a Party Plaintiff" form above.

**CONSENT TO BECOME PARTY PLAINTIFF**

By my signature below, I hereby authorize the filing and prosecution of claims in my name and on my behalf to contest the failure of **Funsan K. Corp. d/b/a Beacon Wines & Spirits**, and/or their respective owners, affiliated companies, subsidiaries, contractors, directors, officers, franchisees and/or affiliates to pay me overtime wages and minimum wages as required under state and/or federal law, and also authorize the filing of this consent in the action(s) challenging such conduct.  I authorize being **named as the representative plaintiff** in this action to make decisions on behalf of all other plaintiffs concerning the litigation, the method and manner of conducting this litigation, the entering of an agreement with Plaintiff's counsel concerning attorneys' fees and costs, and all other matters pertaining to this lawsuit.  I understand that I will be represented by Pelton Graham LLC without prepayment of costs or attorneys' fees. I understand that if plaintiffs are successful, costs expended by attorneys on my behalf will be deducted from my settlement or judgment first.  I understand that my attorneys may petition the court for an award of fees and costs to be paid by defendants on my behalf.  I understand that the fees retained by the attorneys will be either the amount received from the defendants or approximately 1/3 (33.33%) of my total settlement or judgment amount (including fees), whichever is greater.

Ruben B

—————————————————           —————————————————
E164EDA1070F42A...                                     Ruben Bruno
Signature                                                     Printed Name

**CONSENTIMIENTO PARA SER UN DEMANDANTE**

Por mi firma abajo yo autorizo la presentación y tramitación de una acción legal en mi nombre y representación en contra de Funsan K. Corp. d/b/a Beacon Wines & Spirits y sus respectivos propietarios, gerentes, oficiales, directores, sucesores, predecesores, subsidiarias y afiliados para que me sean pagados las horas extras y los salarios mínimos tal como lo requieren las normas estatales y/o federales e igualmente autorizo la presentación de este consentimiento en la acción(es) con el fin de debatir la conducta ilegal. Yo autorizo ser nombrado como **demandante representativo** en esta acción legal para tomar decisiones en nombre de otros demandantes a quienes pueda concernir el resultado de este proceso, el método y la manera en cómo debe llevarse a cabo este litigio, y la decisión de llegar a un acuerdo dentro de la causa y todo lo que concierna a los honorarios profesionales y costas del proceso y cualesquiera otras decisiones relacionadas con este litigio. Yo entiendo que estaré representado por Pelton Graham LLC sin tener que pagar por adelantado costas u honorarios de abogados. Yo entiendo que, si los demandantes tienen éxito, los costos asumidos por los abogados en mi nombre serán deducidos inicialmente de la porción de mi acuerdo en una conciliación o como resultado de una sentencia en juicio. Yo entiendo que mis abogados podrán solicitar a la Corte que les sean retribuidos los honorarios y costas procesales por parte de los demandados en nombre mío.  Yo entiendo que los valores de retención de los abogados podrán ser ya sea el monto recibido por parte de los demandados o el monto aproximado de 1/3 (33.33%) del total del acuerdo de conciliación o del valor obtenido a través de la sentencia (incluyendo honorarios), cual sea la suma más alta.

Ruben B

—————————————————           —————————————————
E164EDA1070F42A...                                     Ruben Bruno
Firma                                                           Nombre Escrito

This is a complete and accurate translation of the English "Consent to Become a Party Plaintiff" form above.

## CONSENT TO BECOME PARTY PLAINTIFF

By my signature below, I hereby authorize the filing and prosecution of claims in my name and on my behalf to contest the failure of Funsan K. Corp. d/b/a Beacon Wines & Spirits, and/or their respective owners, affiliated companies, subsidiaries, contractors, directors, officers, franchisees and/or affiliates to pay me overtime wages and minimum wages as required under state and/or federal law, and also authorize the filing of this consent in the action(s) challenging such conduct. I authorize being **named as the representative plaintiff** in this action to make decisions on behalf of all other plaintiffs concerning the litigation, the method and manner of conducting this litigation, the entering of an agreement with Plaintiff's counsel concerning attorneys' fees and costs, and all other matters pertaining to this lawsuit. I understand that I will be represented by Pelton Graham LLC without prepayment of costs or attorneys' fees. I understand that if plaintiffs are successful, costs expended by attorneys on my behalf will be deducted from my settlement or judgment first. I understand that my attorneys may petition the court for an award of fees and costs to be paid by defendants on my behalf. I understand that the fees retained by the attorneys will be either the amount received from the defendants or approximately 1/3 (33.33%) of my total settlement or judgment amount (including fees), whichever is greater.

_____                          ORlando Zhinin
Signature                                                            Printed Name

## CONSENTIMIENTO PARA SER UN DEMANDANTE

Por mi firma abajo yo autorizo la presentación y tramitación de una acción legal en mi nombre y representación en contra de Funsan K. Corp. d/b/a Beacon Wines & Spirits y sus respectivos propietarios, gerentes, oficiales, directores, sucesores, predecesores, subsidiarias y afiliados para que me sean pagados las horas extras y los salarios mínimos tal como lo requieren las normas estatales y/o federales e igualmente autorizo la presentación de este consentimiento en la acción(es) con el fin de debatir la conducta ilegal. Yo autorizo ser nombrado como **demandante representativo** en esta acción legal para tomar decisiones en nombre de otros demandantes a quienes pueda concernir el resultado de este proceso, el método y la manera en cómo debe llevarse a cabo este litigio, y la decisión de llegar a un acuerdo dentro de la causa y todo lo que concierna a los honorarios profesionales y costas del proceso y cualesquiera otras decisiones relacionadas con este litigio. Yo entiendo que estaré representado por Pelton Graham LLC sin tener que pagar por adelantado costas u honorarios de abogados. Yo entiendo que, si los demandantes tienen éxito, los costos asumidos por los abogados en mi nombre serán deducidos inicialmente de la porción de mi acuerdo en una conciliación o como resultado de una sentencia en juicio. Yo entiendo que mis abogados podrán solicitar a la Corte que les sean retribuidos los honorarios y costas procesales por parte de los demandados en nombre mío. Yo entiendo que los valores de retención de los abogados podrán ser ya sea el monto recibido por parte de los demandados o el monto aproximado de 1/3 (33.33%) del total del acuerdo de conciliación o del valor obtenido a través de la sentencia (incluyendo honorarios), cual sea la suma más alta.

_____                          ORlando Zhinin
Firma                                                                  Nombre Escrito

This is a complete and accurate translation of the English "Consent to Become a Party Plaintiff" form above.